## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| JAMES C. MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-1590 (RBW) |
| | ) | |
| MICHAEL B. DONLEY, | ) | |
| Secretary of the Air Force | ) | |
| | ) | |
| Defendant. | ) | |
| _____) | | |

## MEMORANDUM OPINION

This case arises from claims that the defendant, in his official capacity as the head of the

Department of the Air Force with "final authority over [the] correction of records," unjustifiably

denied the plaintiff's request for various record corrections pertaining to his resignation from the

Air Force Reserve.  Complaint ("Compl.") ¶¶ 3, 7, 9.  Currently before the Court is the

Defendant's Motion to Dismiss ("Def.'s Mot.").[1]  For the reasons explained below, the Court

will grant the defendant's motions.

## I. BACKGROUND

A.  The Anthrax Vaccination Immunization Program

According to the Center for Disease Control ("CDC") "[a]nthrax is an acute infectious

disease caused by [a] spore-forming bacterium."  CDC, Questions and Answers About Anthrax,

EMERGENCY PREPAREDNESS & RESPONSE (Aug. 20, 2008)

---

[1] In addition to the documents already referenced, in resolving the Defendant's Motion to Dismiss, the Court considered the following filings: the Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss ("Def.'s Mem."); the plaintiff's Opposition the Defendant's Motion to Dismiss ("Pl.'s Opp'n"); the Defendant's Reply in Further Support of Motion to Dismiss ("Def.'s Reply"); and the Administrative Record ("A. R.").

   
http://www.bt.cdc.gov/agent/anthrax/faq/ (last updated Aug. 20, 2008).  "Anthrax spores can be used as a bioterrorist weapon," with infections occurring in three forms: "cutaneous (skin), inhalation, and gastrointestinal." Id.

In 1970, the National Institutes of Health ("NIH"), the agency then responsible for licensing biological drugs, licensed Anthrax Vaccine Absorbed ("AVA") "for use against anthrax." Def.'s Mem. at 3; see also Pl.'s Opp'n at 1.  The NIH's AVA license did not "differentiat[e] among possible uses or limit[] the license to particular routes of exposure." Def.'s Mem. at 21 (internal citation omitted).  Subsequently, licensing authority was delegated to the Federal Drug Administration ["FDA"] and the FDA began a "review process to determine whether previously licensed products, including AVA, were safe, effective, and not misbranded." Def.'s Mem. at 3 (internal quotations and citations omitted).  In 1985, an FDA panel noted that "AVA was not licensed against inhalation anthrax." Pl.'s Opp'n at 29.  In 1996, the maker of AVA submitted an Investigational New Drug Application to the FDA, for the "purpose of obtaining a specific indication for inhalation anthrax," which remained pending for several decades. Id. (internal quotations omitted).  As a result, in December 2003, the AVA label still "did not specify which method of anthrax exposure the [v]accine protected against." Id.

In 1997, the Department of Defense ("DoD") initiated the Anthrax Vaccination Immunization Program (the "vaccination program"), "which required members of the Armed Forces at risk of anthrax exposure to submit to mandatory vaccination." Def.'s Mem. at 3; see also Compl. ¶ 12.  The following year, 1998, the vaccination program took effect and AVA inoculations began "as a preventative measure against inhalation anthrax." Compl. ¶¶ 12, 14. That same year, Congress enacted 10 U.S.C. § 1107, which proscribes the "administration of 'investigational' new drugs, or drugs unapproved for their intended use, to service members

without their informed consent." Id. ¶ 13 (internal citations omitted). The requirement that the member provide consent to receive the investigational drug may be waived only by the President. Id. In 1999, President Clinton issued Executive Order 13139, which implemented the informed consent requirement and declared that presidential waiver would only be granted "when absolutely necessary." Id. ¶ 16 (internal quotation omitted).

The vaccination program was implemented without complications until July 17, 2000 when the DoD "dramatically reduce[d] the number of [AVA] inoculations due to an unexpected delay in the availability of vaccine supplies approved by the [FDA] as safe and effective." Id. ¶ 17. The DoD thus maintained the vaccination program only for personnel in areas of "highest threat." Id. In August 2000, the DoD "formally adopted the informed consent requirement" mandated by 10 U.S.C. § 1107. Id. ¶ 18. Nevertheless, on June 28, 2002, the DoD resumed the vaccination program with "mandatory inoculation[s] for military personnel . . . at higher risk whose performance is essential for certain mission critical capabilities." Id. ¶ 19.

Since the 1997 initiation of the vaccination program, there have been several "challenges to the legality of orders requiring military personnel to take [AVA]." Def's Mem. at 3. Notably, in 2003, Judge Emmet Sullivan of this Court ruled that, with regard to inhalation anthrax, "AVA is an investigational drug . . . [that was] being used for an unapproved purpose" in violation of 10 U.S.C § 1107. Id. ¶ 35 (citing Doe v. Rumsfeld, 297 F. Supp. 2d 119, 135 (D.D.C. 2003)). He then granted the plaintiffs' request for a preliminary injunction and enjoined inoculation under the vaccination program. Id.

Shortly after the Doe ruling, the FDA issued a final rule and order "[finding] that AVA was safe and effective 'independent of the route of exposure.'" Id. ¶ 36 (quoting 69 Fed. Reg. 255, 260 (Jan. 5, 2004)). Judge Sullivan, nonetheless, vacated the FDA's rule and order because

"the FDA failed to follow [required] notice and comment procedures." Id. ¶ 37 (citing Doe v. Rumsfeld, 341 F. Supp. 2d 1, 16 (D.D.C. 2004). Finding a clear statutory prohibition on inoculation with investigational drugs, "Judge Sullivan issued a permanent injunction" on the vaccination program until the FDA certified AVA through the proper procedures. Id. ¶ 38 (citing Doe, 341 F. Supp. 2d at 16).

Finally, in December 2005, the FDA issued a new final order "explicitly finding AVA efficacious against inhalation anthrax," id. ¶ 39 (citing Doe v. Rumsfeld, 501 F. Supp. 2d 186, 188 (D.D.C. 2007) (internal citation omitted)), causing the District of Columbia Circuit to subsequently conclude that the injunction against the vaccination program had "dissolved on its own terms." The program was thus reinstated. Id. ¶ 39 (citing Doe v. Rumsfeld, 172 F. App'x, 327, 327 (D.C. Cir. 2006).

Following the Doe rulings, Judge James Robertson, a former member of this Court, declared that "prior to the FDA's December 2005 rulemaking, it was a violation of federal law for military personnel to be subjected to involuntary AVA inoculation because the vaccine was neither the subject of a presidential waiver nor licensed for use against inhalation anthrax." Id. ¶ 40 (quoting Rempfer v. U.S. Dep't of Air Force Bd. for Corr. of Military Records, 548 F. Supp. 2d 200, 210 (D.D.C. 2008)).

Notwithstanding the prior litigation in this Court, other courts have found that AVA has been properly licensed since 1970 and, therefore "the vaccination program [is] . . . a 'lawful response by [the military] to the dangers with which the military personnel of the United States may be confronted in the future." Def's Mem. at 3 (quoting O'Neil v. Secretary of the Navy, 76 F. Supp. 2d 641, 645 (W.D. Pa. 1999)). And the Court of Appeals for the Armed Forces concluded in 2006 that AVA was properly licensed since 1970 and held "that the Doe court

decisions did not affect the legality of the [v]accination order." Id. at 6-7 (referencing United States v. Kisala, 64 M.J. 50, 54 (C.A.A.F. 2006).

   B.   The Plaintiff's Factual Assertions

        Drawing all justifiable inferences in favor of the plaintiff, as the Court must, the factual allegations underlying this lawsuit are as follows.  In 1992, the plaintiff enlisted in the United States Marine Corps Reserve and was later discharged in 1995.  Compl. ¶ 8.  Subsequently, the plaintiff joined the Air Force Reserve and was gradually promoted until he reached the rank of First Lieutenant in 1999.  Id. ¶¶ 8, 10.  Throughout his military career, the plaintiff  "amassed an exemplary military record" demonstrating that he was a "highly competent officer" who "met all performance standards and earned positive assessments from his raters and reviewers."  Id. ¶ 11.

        By April 2000, the plaintiff had received three shots of a six-shot series of AVA as part of the DoD's vaccination program.  Id. ¶¶ 21, 12, 14.  The plaintiff had adverse reactions to AVA and "his reaction worsened" with each shot.  Id. ¶ 21.  After his third shot of AVA, the plaintiff became "dizzy," felt "extreme pain throughout his body that made it difficult to move," and experienced "extreme sore[ness] and . . . severe headaches."  Id.  The worst effects lasted approximately ten days and it took "another week [for the plaintiff] to fully recover."  Id.  On April 18, 2000, the plaintiff reported his symptoms and expressed his "concerns about severe, long-term reactions to [AVA]" to "medical personnel who completed a Vaccine Adverse Event Reporting System report."  Id. ¶¶ 22, 23.  That same day, the plaintiff requested to be "separated from the Air Force," but his request was later denied.  Id. ¶¶ 23, 24.

        On May 10, 2000, the plaintiff "willfully disobey[ed] a lawful command from his superior officer . . . to have himself inoculated with [AVA]."  Id. ¶ 27.  The following day the plaintiff was offered a nonjudicial punishment for his transgression, which he accepted.  Id. ¶ 25.

The punishment consisted of "a forfeiture of $605[] per month for two months and a Letter of Reprimand." Id. ¶ 26.

Approximately a month later, the plaintiff's commander informed him that "he was facing involuntar[y] discharge from the Air Force for the commission of a serious offense." Pl.'s Opp'n at 6. Rather than face "further administrative actions," the plaintiff "[t]endered his resignation" on June 12, 2000. Compl. ¶ 28. A few weeks later, the plaintiff's "request [for resignation] was found legally sufficient" and was endorsed by several superior officers, including the Secretary of the Air Force. Id. ¶¶ 29-30. Ultimately, the plaintiff's resignation was approved and he was "discharged with a general (under honorable conditions)" characterization. Id. ¶¶ 31, 32.

C.   The Plaintiff's Pursuit of Administrative Remedies and the Parties' Arguments

On July 30, 2003, the plaintiff applied to the Air Force Discharge Review Board ("Review Board"), "requesting an upgrade of [his] discharge characterization to Honorable" as a matter of equity. Id. ¶¶ 41, 42. His request was based on the DoD's "change in . . . policy regarding administration of the vaccination program," which would have allowed him to withhold consent and avoid AVA inoculation without disobeying a lawful order, and on "his otherwise meritorious service." Id. ¶ 42. The Review Board denied the plaintiff's request in February 2004. Id. ¶ 43.

In October 2008, the plaintiff petitioned the Air Force Board for the Correction of Military Records ("Board for Correction"), seeking several forms of relief, including his previous demand for a "[c]hange of character of service to Honorable," on the basis that the order to submit to AVA injection was illegal. Id. ¶ 44. Following nine advisory opinions, two supplementary advisory opinions, and an additional advisory opinion from the Air Force

Administrative Law Division—all of which recommended denial—the plaintiff's request was formally denied on April 23, 2010. <u>Id.</u> ¶¶ 47-73.

 As a result, the plaintiff brought this case challenging the Board for Correction decision as "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise contrary to law." <u>Id.</u> ¶ 87.  In response, the defendant filed the motion to dismiss currently before the Court. Def.'s Mot.  The defendant asserts that the plaintiff's challenge to the Board for Correction decision is meritless because "[AVA] has been legally licensed for inoculation against anthrax since 1970" and the order to submit to AVA inoculation was lawful. Def.'s Mem. at 20.  The plaintiff responds by arguing that his claim is meritorious because he was properly entitled to the requested corrections from the Board for Correction because, pursuant to the rulings in <u>Doe</u>, "it is settled law in this jurisdiction that pre-2005 military orders to involuntarily inoculate service members were illegal."  Pl.'s Opp'n at 26.  Accordingly, he contends that the Board for Correction was required "to correct all orders emanating from the illegal orders, [including] non-judicial punishment records as well as the adverse discharge documentation."  <u>Id.</u> at 33.  This Memorandum Opinion addresses these arguments.

## II. STANDARD OF REVIEW

 The defendant has moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  However, Rule 12(d) provides that "if, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  Because both parties have presented material outside the pleadings (namely, the administrative record) for the Court to consider in adjudicating the motions, the Court deems it appropriate to treat the

defendant's motion to dismiss as a motion for summary judgment.  See Marshall Cnty. Health

Care. Auth. v. Shalala, 988 F.2d 1221, 1226 & n.5 (D.C. Cir. 1993) (noting that a district court

considering a Rule 12(b)(6) motion "can consult the [administrative] record to answer the legal

question[s] before the court," but that "[i]t is probably the better practice for a district court

always to convert to summary judgment." (emphases added)).

      "Summary judgment is the proper mechanism for deciding, as a matter of law, whether

an agency action is supported by the administrative record and consistent with the

[Administrative Procedure Act, 5 U.S.C. § 702 (2006),] standard of review."  Loma Linda Univ.

Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Stuttering Found. of Am. v.

Springer, 498 F. Supp. 2d 203, 207 (D.D.C. 2007)); see also Richards v. INS, 554 F.2d 1173,

1177 & n.28 (D.C. Cir. 1977).  But due to the limited role of a court in reviewing the

administrative record, the typical summary judgment standards set forth in Rule 56 are not

applicable.  Stuttering, 498 F. Supp. 2d at 207 (citation omitted).  Rather, "[u]nder the APA, it is

the role of the agency to resolve factual issues to arrive at a decision that is supported by the

administrative record, whereas 'the function of the district court is to determine whether or not as

a matter of law the evidence in the administrative record permitted the agency to make the

decision it did.'"  Id. (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir.

1985)).

### III.  LEGAL ANALYSIS

A.  The Court's Jurisdiction Over Claims Against the Federal Government

      As an initial matter, the Court must decide whether, and on what basis, it possesses

jurisdiction to review the parties' claims.  The defendant contends that the plaintiff is seeking

monetary damages, and that this action is thus one based in part on the Little Tucker Act, 28

U.S.C. § 1346(a)(2) (2006).[2]  Def.'s Mem. at 12-15.  The plaintiff maintains, however, that this

suit is one properly brought under the Administrative Procedure Act ("APA").  Compl. ¶ 1.

Because an APA claim is only appropriately pleaded "when there is no other adequate remedy,"

the Court must first determine whether this action is one properly brought under the Tucker Act.

Calloway v. Brownlee, 366 F. Supp. 2d 43, 50 (D.D.C. 2005) (internal citation omitted).[3]

       "As a sovereign, the United States may not be sued except by its consent, and a fortiori

the government can place conditions on the circumstances under which it will consent to suit."

Bublitz v. Brownlee, 309 F. Supp. 2d 1, 5 (D.D.C. 2004) (internal citations omitted).  The APA

and the Tucker Act both waive sovereign immunity, allowing plaintiffs to sue the United States

in specific circumstances.  Under the APA, a plaintiff may sue the United States "in the district

courts for remedies other than money damages arising from an agency's unlawful action."  Id.

(emphasis in the original); see 5 U.S.C. §§ 701-06.  Alternatively, the Tucker Act grants the

United States Court of Federal Claims exclusive jurisdiction to "hear monetary claims against

the United States founded either upon an express or implied contract or upon a provision of the

Constitution, or any Act of Congress, or any regulation of an executive department that 'can

fairly be interpreted as mandating compensation by the Federal Government for the damages

sustained,'" Cartwright Int'l Van Lines, Inc. v. Doan, 525 F. Supp. 2d 187, 194 (D.D.C. 2007)

(quoting United States v. Mitchell, 463 U.S. 206, 217 (1983)), "even if such claims could be

---

[2]      "The Tucker Act consists of 28 U.S.C. § 1491, which sets out the jurisdiction of the Claims Court, and §
1346(a)(2), which gives concurrent jurisdiction to the district courts for claims not exceeding $10,000.  The Federal
Circuit affectionately refers to the latter section as the "Little Tucker Act."  Van Drasek v. Lehman, 762 F.2d 1065,
1067 (D.C. Cir. 1985).  Both sections will be referenced in this Memorandum Opinion as the Tucker Act.

[3]      If this suit were characterized as one for money damages, there is no dispute that this Court's jurisdiction
would be pursuant to the Tucker Act, as the plaintiff has waived "any right or entitlement to recover monetary
damages greater than $10,000," Compl. ¶ 5; Def.'s Mem. at 12-13; Pl.'s Opp'n at 15-17.

brought within the terms of some other jurisdictional grant," <u>Brown v. West</u>, 1995 WL 623038

*1, *3 (D.D.C. 1995); <u>see</u> 28 U.S.C. § 1491; <u>Bowen v. Massachusetts</u>, 487 U.S. 879, 910 n.48

(1988).  Additionally, the Tucker Act grants "district courts concurrent jurisdiction with the

Court of Federal Claims in most Tucker Act cases seeking less than $10,000."  <u>Kidwell v. Dep't

of the Army</u>, 56 F.3d 279, 283 (D.C. Cir. 1995) (citing 28 U.S.C. § 1346(a)(2)).

      The District of Columbia Circuit has established a bright-line test for determining

whether a plaintiff's claim regarding an agency's actions should be considered under the district

court's APA jurisdiction or its Tucker Act jurisdiction.  <u>Kidwell</u>, 56 F.3d at 284-87.  Under this

test, a case is considered a Tucker Act case "only if the plaintiff seeks money or the district court

grants it."  <u>Id.</u> at 285.  Accordingly, "complaints requesting injunctive relief generally will be

taken at their word for jurisdictional purposes."  <u>Bublitz</u>, 309 F. Supp. 2d at 6 (citing <u>Vietnam

Veterans of Am. v. Sec'y of the Navy</u>, 843 F.2d 528, 535 (D.C. Cir. 1988)).

      Nevertheless, as this Court has noted, "the bright-line rule . . . turns out to be rather dim,

for the court of appeals has recognized that not all complaints asking for equitable relief will be

taken at face value."  <u>Id.</u>; <u>see</u> <u>Kidwell</u>, 56 F.3d at 283 ("The plain language of a complaint . . .

does not necessarily settle the question of Tucker Act jurisdiction.").  Because plaintiffs may try

to avoid Tucker Act jurisdiction "by converting complaints which 'at their essence' seek money

damages from the government into complaints requesting injunctive relief or declaratory

actions," district courts must "look to the complaint's substance, not merely its form."  <u>Kidwell</u>,

56 F.3d at 284.  To do this, district courts "weigh the relative importance of the monetary

recovery against the equitable relief, and [find Tucker Act] jurisdiction where the injunctive

relief sought is of 'negligible' worth or lacks 'considerable' value."  <u>Bublitz</u>, 309 F. Supp. 2d at

8 (citing <u>Kidwell</u>, 56 F.3d at 284).  Thus "a district court will not lose [APA] jurisdiction over a

claim for injunctive relief where that injunctive relief triggers the payments of money, so long as the injunctive relief is of sufficient importance relative to the monetary award to support jurisdiction."  Id. (emphasis omitted); see Wolfe v. Marsh, 846 F.2d 782, 784 n.3 (D.C. Cir. 1988).

Applying this Circuit's Kidwell bright-line test and subsequent cases interpreting that test to the present litigation, the Court finds: (1) that the plaintiff has not explicitly requested money damages, and (2) that the plaintiff's requested relief is not in essence a request for money. Accordingly, the plaintiff's cause of action does not fall under the purview of the Tucker Act.  In Kidwell, a plaintiff asked the court to "correct [his] army record to reflect military retirement in pay grade E-4 . . . [and] any other relief he may be entitled to," 56 F. 3d at 283.  Similarly, the plaintiff in the instant case has asked the Court to "correct [his] record to reflect credit for back pay and allowances . . . and grant any other relief."  Compl. (Prayer for Relief) at 20.  The District of Columbia Circuit held that because the plaintiff in Kidwell  "d[id] not explicitly request monetary relief from the United States, jurisdiction under the APA would appear to lie." 56 F.3d at 284.  Correspondingly, because the plaintiff here has not explicitly sought monetary relief his suit is properly pleaded under the APA.

Moreover, "any financial benefit [the] plaintiff may receive would not come from an award of money damages by this Court but from the change in his status that would result from the correction of his military records."  Charlton v. Donley, 611 F. Supp. 2d 73, 76 (D.D.C. 2009); see Kidwell, 56 F.3d at 285-86 ("[A]ny monetary benefits that may flow from [the plaintiff's record correction] would not come from [this] court's exercise of jurisdiction, but from the structure of the statutory and regulatory requirement governing compensation when a servicemember's files change."); Tootle v. Sec'y of Navy, 446 F.3d 167, 175 (D.C. Cir. 2006)

("[A]ny monetary benefits that might flow if [the plaintiff] prevails on his non-monetary claims [for record corrections] will not come from the [d]istrict [c]ourt's exercise of jurisdiction." (citing <u>Kidwell</u>, 56 F.3d at 285-86)).  As this Circuit has acknowledged, such "collateral consequences of equitable relief do not implicate the Little Tucker Act."  <u>Wolfe</u>, 846 F.2d at 784. Accordingly, it is irrelevant that the plaintiff here may receive credit for back pay as a consequence of his requested record corrections, or that he "hints at some interest in a monetary reward from the federal government," <u>Kidwell</u>, 56 F.3d at 284, because "a claim is not for money [damages] merely because its success may lead to pecuniary costs for the government or benefits for the plaintiff," <u>Vietnam Veterans of Am.</u>, 843 F.2d at 534.

Additionally, the defendant's contention that the plaintiff's waiver of "any right or entitlement to recover monetary damages greater than $10,000 in this action," Compl. ¶ 5, "avails [the plaintiff] of this [Court's] concurrent jurisdiction under the Little Tucker Act," Def.'s Mem. at 13, is incorrect.  It is well established in this Circuit that "[a]s it relate[s] to a complaint which does not request monetary relief, [a plaintiff's] waiver [of damages in excess of $10,000] is ambiguous at best; there [is] no monetary claim to waive." <u>Wolfe</u>, 846 F.2d at 784. Because "it is an extremely rare plaintiff who has trouble asking for money, if that is what he wants," courts will not imply monetary claims when the plaintiff has not explicitly requested them.  <u>Id.</u> at 784 n.2.  "Given the need for certainty . . . , [the Court] cannot allow [the] plaintiff's subjective intent, ambiguously expressed, to control the issue [of proper subject matter jurisdiction]."  <u>Id.</u> at 785.

Furthermore, this Court finds that beyond the complaint's plain language, the plaintiff's request is not "in essence" one for money damages because the record correction it seeks is "valuable non-monetary relief."  <u>Kidwell</u>, 56 F.3d at 286.  As this Circuit has repeatedly

12

recognized "a plaintiff seeking a change in discharge status has sought non-monetary relief that is not 'negligible in comparison' to the likely monetary benefit [the] plaintiff might receive as a result of the change in status." Charlton, 611 F. Supp. 2d at 77; see Smalls v. United States, 471 F.3d 186, 190 (D.C. Cir. 2006) (holding that a district court has jurisdiction to change a plaintiff's discharge status even if doing so would automatically entitle the plaintiff to retirement benefits); Tootle, 446 F.3d at 176 (finding that a district court has jurisdiction over a plaintiff's record correction claim even if such a correction would entitle him to retirement benefits).

Here, the plaintiff requests "relief [that] is equitable, seeking declaratory or injunctive relief." Pl.'s Opp'n at 14. Most importantly, the plaintiff asks this Court to "[o]rder the Board for Correction to remove the adverse 'Misconduct' narrative characterization [in his record] . . . and to modify [his] record to reflect that [he] was retired and not adversely discharged," Compl. (Prayer for Relief) at 19-20; see Compl. ¶ 32 (currently the plaintiff's record reflects a "general [discharge] (under honorable conditions)"). This Circuit has recognized that raising a plaintiff's discharge status "would lift some of the shame associated with failing to receive an honorable discharge." Kidwell, 56 F.3d at 284; see generally Christopher H. Lunding, Judicial Review of Military Administrative Discharges, 83 Yale L.J. 33, 35 (1973) (noting the stigma that flows from a general discharge). Furthermore, this Court has previously accepted that the elimination of such stigma has "considerable value." Calloway, 366 F. Supp. 2d at 51. In the case at hand, then, the plaintiff seeks equitable "non-monetary relief that is 'not negligible in comparison' to the likely monetary benefit [the] plaintiff might receive as a result of the change in status." Charlton, 611 F. Supp. 2d at 77.

After carefully weighing the "relative importance of the [plaintiff's] monetary recovery," Bublitz, 309 F. Supp. 2d at 8, which, as noted, cannot exceed $10,000, see Compl. ¶ 5, against

the valuable equitable relief sought, the Court determines that the plaintiff's claims in this case are not "in essence" for money damages.  Thus, the plaintiff's claims are not predicated on the Tucker Act; rather, the plaintiff has pleaded APA claims, which the Court may review pursuant to its federal question jurisdiction.

While this Court recognizes the effort made by Congress to ensure that claims for money damages against the United States receive uniform adjudication, the Court joins other judges from the courts of this Circuit in noting its frustration with the quagmire that is the Tucker Act and its imprecisely drawn jurisdictional provision.  See Sharp v. Weinberger, 798 F.2d 1521, 1522 (D.C. Cir. 1986) ("If there is a less profitable expenditure of the time and resources of federal courts and litigants than resolving a threshold issue of [Tucker Act jurisdiction], it does not readily come to mind."); Van Drasek, 762 F.2d at 1072 ("The burden of wading through this jurisdictional quagmire outweighs, we think, the limited utility of providing uniform adjudication of such relatively small money claims against the United States.")

B.  The Plaintiff's APA Claims

The plaintiff asserts that the Board for Correction's decision to deny his requested record correction was "arbitrary, capricious, [and] an abuse of discretion," Compl. ¶ 89, for three separate reasons: (1) that "[t]he [Board for Correction] erroneously concluded that the order to submit to the [vaccination program] was not illegal," id. ¶ 85; (2) that "[t]he [Board for Correction] erroneously concluded that 10 U.S.C. § 1552(f) prohibited the [Board for Correction] from considering legal arguments attacking military justice actions that are not court-martial actions," id. ¶ 86; and (3) that "[t]he [Board for Correction] failed to apply [its own] precedent as required by the law of this Circuit," id. ¶ 87.  In contrast, the defendant asserts that

"there is no basis to question the [Board for Correction]'s decision, much less set it aside under the 'unusually deferential' standard applicable here," Def.'s Mem. at 2.

As the plaintiff correctly notes, the correction of military records is governed by 10 U.S.C § 1552.  Compl. ¶ 80.  This statute "provides that '[t]he Secretary of a military department may correct any military record . . . when the Secretary considers it necessary to correct an error or remove an injustice."  Schwalier v. Panetta, 839 F. Supp. 2d 75, 82 (D.D.C. 2012) (alterations in original) (citing 10 U.S.C. § 1552(a)(1)).  Within the Air Force, the correction of military records is undertaken by "a panel of at least three [Board for Correction] members . . . act[ing] for the Secretary of the Air Force."  Id. at 83 (citing 32 C.F.R. § 865.0-865.8 (outlining the procedures governing the correction of military records for the Air Force)).

Federal courts may review the "decisions made by the [Board for Correction] under the APA."  Wilhelmus v. Geren, 796 F. Supp. 2d 157, 161 (D.D.C. 2011); see Kidwell, at 283-84. These decisions are assessed under the "arbitrary, capricious, or contrary to law" standard, Kidwell, 56 F.3d at 286, which directs that "an agency action is arbitrary and capricious if the agency failed to follow procedures as required by law, or has entirely failed to consider an important aspect of the case."  Calloway, 366 F. Supp. 2d at 53; see 5 U.S.C. § 706(2); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., Co., 463 U.S. 29, 43 (1983).  "This is a 'narrow' standard of review as courts defer to the agency's expertise."  Wilhelmus, 796 F. Supp. 2d at 160 (citing Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).

Furthermore, this Circuit has recognized that because the language of 10 U.S.C § 1552(a) "fairly exudes deference" to the Secretary, decisions of the Board for Correction are evaluated by an "unusually deferential application of the 'arbitrary or capricious' standard."  Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1514 (D.C. Cir. 1989).  Although the "unusually deferential" standard

does not make the Board for Correction's decisions "utterly unreviewable, . . . only the most

egregious decisions may be prevented." Id. at 1514-15.  Accordingly, the Board for Correction's

decision "need not be 'a model of analytic precision,'" but "[it] 'must minimally contain a

rational connection between the facts found and the choice made.'"  Wilhelmus, 796 F. Supp. 2d

at 163 (quoting Dickson v. Sec'y of Defense, 68 F.3d 1396, 1404 (D.C. Cir. 1995)).  In this way,

the deferential standard ensures that a court does not "substitute its judgment for that of the

agency," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, or "supply a reasoned basis for the

agency's decisions that the agency itself has not offered," Puerto Rico Higher Educ. Assistance

Corp. v. Riley, 10 F.3d 847, 850 (D.C. Cir. 1993) (internal citation omitted).  Rather, "the court .

. . ensure[s] that the agency 'examined the relevant data and articulate[d] a satisfactory

explanation for its action," Calloway, 366 F. Supp. 2d at 54 (citing Riley, 10 F.3d at 850), by

limiting its review to "the administrative record already in existence [and] not some new record

made initially in the reviewing court," Wilhelmus, 796 F. Supp 2d at 161; see Camp v. Pitts, 411

U.S. 138 (1973).

As far as the plaintiff's first two challenges are concerned, the Court is not persuaded that

the Board for Correction acted arbitrarily or capriciously in concluding that "the order to submit

to the vaccination program was not illegal," and that it should "defer to the Court of Appeals for

the Armed Forces in [United States v. Kisala, 64 M.J. 50 (2006)]."  Def.'s Mem at 10.  The

parties agree, and the Administrative Record is clear, that before the Board for Correction made

its final ruling it sought the recommendations of nine advisory opinions from various offices in

the Air Force, as well as from the Air Force Administrative Law Division.  Compl. ¶ 47, 59; see

also Def.'s Mem. at 10; A.R., Ex. A (May 13, 2010 R. of Proceedings) at 10-11.  After

consulting these opinions, the Board for Correction decided not to second-guess the military

court's decision on a "basic legal issue" of military justice.  A.R., Ex. A (May 13, 2010 R. of

Proceedings) at 10-11.  In the alternative, the Board for Correction concluded that even if it were

to undertake its own review of the legality of the vaccination program order it was "not

convinced the order was illegal."  Id. at 11.  The Board for Correction then gave several

justifications for why it would not invalidate the order, relying heavily on the analysis in the

advisory opinions.  Id.  A reasoned decision is certainly not the type of "egregious decision[]"

the Court should undo.  See Kreis, 866 F. 2d at 1515.  In fact, the Court finds that the Board for

Correction's decision is supported by substantial evidence.  See Knight v. US, 2012 WL 983148

*1, *6 (D.D.C. 2012) (setting forth standard of review requiring determination only whether

conclusion is supported by substantial evidence); Walker v. Shannon, 848 F. Supp. 250, 255

(D.D.C. 1994).  Because a review of the Board for Correction's decision is not intended to "

reweigh[] . . . the evidence," id., and because the deferential standard of review prohibits a court

from "substitut[ing] its judgment for that of the [Board for Correction]," Motor Vehicle Mfrs.

Ass'n, 463 U.S. at 43, the Court is satisfied that the Board for Correction's decision sufficiently

contains a "rational connection between the facts . . . and the choice made," Dickinson, 68 F.3d

1396.

        Lastly, the plaintiff contends that the Board for Correction's failure to consider or

distinguish a relevant precedent was arbitrary and capricious.  Compl. ¶ 87.  The plaintiff points

to the Board for Correction's review of Docket No. 00-01870, A.R., Ex. B (Jan. 31, 2001 R. of

Proceedings) at 3-7.  In that case, the plaintiff had also refused "a lawful order directing her to

take a mandatory [AVA] vaccination," after suffering adverse effects from previous AVA

injections.  Id. at 3.  After facing discharge proceedings, she was ultimately discharged for her

refusal with a "general (under honorable conditions) discharge."  id. at 4, and subsequently she

sought a change in her record to indicate a "medical discharge" instead, id. at 6.  There, the Board for Correction granted the applicant's correction and instructed her discharge status to be changed to an "Honorable Discharge."  Id. at 7.

The defendant asserts that because the plaintiff "never cited [the precedent] or otherwise called attention to it in proceedings before the board . . . he waived this issue at the agency level, and many not now challenge the [Board for Correction's] decision on this basis."  Def.'s Mem at 29.  While the plaintiff does not dispute his failure to cite to this specific precedent during the administrative process, he does note that he pursued his case as a "pro se applica[nt]" at the agency level.  Pl.'s Oppn' at 7.  It is well established that when it comes to pro se applicants, "this Court and the agency must take pains to protect the rights of pro se parties against the consequences of technical errors," Calloway, 366 F. Supp. 2d at 55, by "hold[ing] [them] to less stringent standards," Crisafi v. Holland, 655 F.2d 1305, 1308 (D.C. Cir. 1981).  See also Haines v. Krener, 404 U.S. 519, 520 (1972).  Accordingly, the Court will not hold against the plaintiff the fact that his pro se application at the agency level failed to cite precedent he now relies upon.

The defendant alleges that "[e]ven if the plaintiff had cited the [Board for Correction's previous] decision, it would provide no basis for remand" because that decision was "an act of grace . . . rather than precedential application of agency policy."  Def.'s Mem.at 30.  In the alternative, the defendant contends that even if the Board for Correction's decision in the instant case was a departure from precedent, "the [Board for Correction] clearly predicated its decision on considerations that were not applicable in Docket No. 00-01870."  Id.

The Court will not reach whether Docket No. 00-01870 was in fact precedential or not because it is clear that, here, the Board for Correction sufficiently distinguished the plaintiff's case from the circumstances in Docket No. 00-01870 by undertaking new considerations not

previously contemplated.  Although "an agency must adhere to its precedents in adjudicating

[the] cases before it," Consol. Edison Co. of N.Y., Inc. v. FERC, 315 F.3d 316, 323 (D.C. Cir.

2003), a reviewing court "do[es] not require an agency to grapple with every last one of its

precedents no matter how distinguishable," Jicarilla Apache Nation v. U.S. Dep't of Interior, 613

F.3d 1112, 1120 (D.C. Cir. 2010) (citing LeMoyne-Owen College v. NLRB, 357 F.3d 55, 60

(D.C. Cir. 2004)).  Indeed, the court will "permit agency action to stand . . . where distinctions

between the case under review and the asserted precedent are so plain that no inconsistency

appears." Bush-Quayle '92 Primary Comm., Inc. v. FEC, 104 F.3d 448, 454 (D.C. Cir. 1997).

Furthermore, "[w]here the reviewing court can ascertain that the agency has not in fact diverged

from past decisions, the need for a comprehensive and explicit statement of its current rationale

is less pressing," Hall v. McLaughlin, 864 F.2d 868, 872 (D.C. Cir. 1989), and an agency "may

distinguish precedent simply by emphasizing the importance of considerations not previously

contemplated. . . . [I]n so doing it need not refer to the cases being distinguished by name."

Envtl. Action v. FERC, 996 F.2d 401, 411-12 (D.C. Cir. 1993).

    Here, the Board for Correction based much of its decision on the Kisala decision, in

which the court determined that a 2000 order to submit to AVA was lawful, 64 M.J. 50, 55

(C.A.A.F 2006).  A.R. at 10-11. As Kisala was decided in 2006, and Docket No. 00-01870 was

decided in 2000, it is clear that here the Board for Correction took into account considerations

that were not previously contemplated.  In its deliberation of the instant case, the Board for

Correction also focused on the fact that the plaintiff  "made an informed decision to resign."

A.R. at 12.  This is patently different than was the situation in Docket No. 00-01870, where the

plaintiff was facing discharge proceedings.  Accordingly, the Court finds that this case is

distinguishable from the earlier case cited by the plaintiff and the Board for Correction

considered factors that were not presented in the prior case—Docket No. 00-01870—in reaching

its decision.  Thus the plaintiffs APA challenges to the Board for Correction's decision must be

rejected.

### III.  CONCLUSION

For the foregoing reasons, this Court grants the defendant's motion to dismiss.[4]

REGGIE B. WALTON
United States District Judge

---

[4]   The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.